# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00127-CV

---

**Cameron Harris, Appellant**

**v.**

**Chelsea True, Appellee**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-23-008574, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Cameron Harris filed an original petition in a suit affecting the parent-child relationship to seek possession of Luke,[1] who he shares with Chelsea True. After a four-day trial, a jury found that True should have the exclusive right to designate Luke's primary residence, and the trial court determined the remaining issues, including naming the parents joint managing conservators of Luke; adopting a custom step-up schedule for Harris's periods of possession; ordering that Harris pay child support, retroactive child support, and True's attorney's fees; and enjoining the parents from certain behavior. In five issues, Harris challenges the trial court's awards of retroactive child support and True's attorney's fees, the possession terms, the determination that True have the exclusive right to make invasive medical decisions and serve as "tie-breaker" on certain decisions, and the final order's permanent injunctions.

---

[1] We refer to the children discussed in this opinion by aliases. *See* Tex. Fam. Code § 109.002(d).

We will remand for the trial court to reconsider the attorney's fees award and otherwise affirm the order.

**BACKGROUND[2]**

Harris and True met around 2016 and by August 2021, they were in an on-and-off romantic relationship. Harris lived in the Dallas area and is the co-owner of a successful business. True lives in Austin with her teenage son, Evan, from a prior relationship and works remotely from her home in Westlake. The couple saw each other periodically, and during their time together, Harris and True sometimes drank heavily. Harris agreed that he was previously an "occasional user of hard or illegal drugs," particularly cocaine, admitted to drinking and driving on multiple occasions, and admitted to combining alcohol, cocaine, and energy drinks with his prescription Adderall.

True got pregnant in spring 2022 and was initially hesitant to tell Harris because Harris had expressed that he did not want to have children. Harris was distrustful of True and "accused her of taking fertility medication at the time she found out she was pregnant." But True and Harris continued their relationship and shared the news of True's pregnancy with their families. After Luke was born in December 2022, Harris returned to his home outside of Dallas. He visited True, Evan, and Luke in Austin, particularly for special occasions and Luke's doctor's appointments, but the couple did not make plans for Harris to move to Austin or for True, Evan, and Luke to move to the Dallas area.

As Sherita Lynch, the guardian ad litem appointed in this case, testified, Harris and True were both "doing quite a bit of drinking and socializing" and "prioritized their relationship"

---

[2] The background facts are derived from the testimony and evidence admitted at trial.

2

over Luke's best interest when Luke was very young. But by April 2023, the couple's romantic relationship deteriorated after Harris would not agree to have another child with True. Harris and True soon became distrustful of each other. Harris testified that True was overly restrictive with his access to Luke and did not permit Harris to see Luke as often as he would have liked or to parent Luke by himself. On the other hand, True testified that she was "very hesitant" to leave Luke with Harris without court orders because Harris "threatened to take our child to Dallas and not bring him back," though Harris disputes this. True also maintained that Harris had not been alone with an infant before and when he visited, he was not "volunteering and helping" her with Luke's care, including diaper changes and nighttime wakings.

In November 2023, Harris filed an original petition in a suit affecting the parent-child relationship. Lynch, the guardian ad litem, was appointed by the trial court on Harris's request. Based on her observations throughout litigation, Lynch recommended a possession schedule for Harris that gradually increased to include overnight visits, to which True agreed. However, Harris sought more time with Luke and maintained his demand for a jury trial on the issue of which parent has the exclusive right to designate Luke's primary residence.

Though his pleadings changed throughout the litigation, Harris's live pleading at trial sought for him to be designated as the conservator with the exclusive right to designate Luke's primary residence restricted to Travis County and Collin County. However, just before trial (in a pleading that the trial court struck on True's motion), Harris agreed to restrict Luke's residence to Travis County. Harris maintained that he was looking to buy a house in Austin but could continue living in his furnished rental in Austin in the meantime. He was unsure of which schools Luke would attend in the area for preschool or elementary school in either his rental or the home he sought to purchase. But Harris urged that he believed he could better "facilitate the relationship"

3

of coparenting with True so that both he and True "can be in our child's life [] forever with no problems."

In her counterpetition, True sought to be named the conservator with the exclusive right to designate Luke's primary residence within Travis County, the exclusive right to consent to invasive medical procedures, and the right to serve as the tiebreaker in case she and Harris cannot agree on decisions concerning Luke's psychiatric and psychological treatment or education. She also sought specific injunctive relief.

True testified regarding which schools Luke would be zoned to attend based on her address and provided several options for his preschool. True also testified that she has been the primary parent in scheduling medical appointments for Luke and believed she was in the best position to be the tiebreaker on these decisions because Harris "doesn't understand how health insurance works" and "doesn't understand a lot of the medical issues that come up with children[.]"

During discovery in this case, True learned that Harris had recorded several of their conversations, and in 2022, Harris had created multiple email accounts in her name so that he could access True's prescription records online without her consent. Harris also admitted to creating an account in True's name to monitor her credit. True sought a protective order, and the docket notes (admitted at trial) demonstrate that in the protective-order suit, the trial court determined "an act of harassment had been committed." However, True's request for a protective order was denied because "there was no probability or likelihood that another one would be committed in the future."

Though Harris's drug and alcohol use was a prominent issue throughout this litigation, he testified that he has not used illegal drugs since April 2023, when he admitted to last using cocaine, and has not consumed alcohol since September 2023. Harris has been using

4

Soberlink testing since then and admitted evidence of 1,806 compliant, zero noncompliant, and 35 missed tests between September 2023 and September 2024.

True expressed concerns with some of the individuals Harris either exposed Luke to or selected to care for Luke during Harris's possession. For example, Harris admitted that he had used Austin Edwards, an Austin-based friend as Luke's babysitter, despite knowing that Edwards is a recovering alcoholic, had child-protective services investigations regarding his own children in the past, and had committed domestic violence against his partner. Harris also acknowledged that he took Luke to visit Susan Carlson, Evan's paternal grandmother, without telling True. Harris had never met Carlson before, but during this litigation, he became suspicious that True was responsible for Evan's father's absence from Evan's life, and both Harris and his family members contacted Carlson. After taking Luke to visit Carlson, however, Harris learned that a court order prevents Carlson from having contact with her grandson, Evan, and True's alleged alienation of Evan's father was unsubstantiated. Harris later testified that he "could see how [True] would be upset about [Luke] seeing someone that she doesn't want [him] to see" and admitted he stopped talking to Carlson based on Lynch's advice.

Several of True's long-term friends testified in support of her abilities as a parent, noting that she "always puts [her children] first" and does not talk negatively about either Evan's or Luke's fathers in front of her children. True's mother testified to True's numerous supportive family members in the Austin area who are regular fixtures in Evan's and Luke's lives. True also testified to the "love and [] true connection" between Evan and Luke.

Lynch emphasized that it is in Luke's best interest "to have both of his parents in his life" and "to have both of his parents make decisions in his life." She opined that "these parents have the ability to make joint decisions for their child," pointing out that no evidence reflected any

5

disagreements in decisions regarding Luke's care besides where he should live. Lynch emphasized that the couple's "toxic" communication did not result in any disagreement regarding parenting decisions.

Lynch further testified that it is in Luke's best interest "to reside in Travis County and to have Miss True designate that residency," as she noted that attempting "to construct a sibling possession plan with three children[3] with one or both of the parties residing over 100 miles apart . . . would be quite difficult and not in [Luke's] best interest" and that Harris is "going to need a little time to find a permanent home to live in." Lynch's recommendations also included that Luke's residency be restricted to Eanes Independent School District and a step-up plan for possession until Luke turns three.

The jury determined that True should have the exclusive right to designate Luke's primary residence. The remaining issues were submitted to the trial court, which issued findings of fact and conclusions of law regarding conservatorship, possession and access, child support, attorney's fees, and permanent injunctions. Relevant here, the final order required Harris to pay $22,080 in retroactive child support and $1,956.45 in retroactive medical and dental support, as well as $1,840 per month in child support and $92,096.06 for True's reasonable and necessary attorney's fees, plus $15,000 in appellate attorney's fees. The order adopted Lynch's recommended step-up possession order and awarded True the exclusive right to consent to medical, dental, and surgical treatment involving invasive procedures, as well as to act as the tiebreaker and make the final decision if the parties cannot agree regarding Luke's psychiatric and psychological treatment and education. Finally, the order enjoined both Harris and True from certain activities, including

---

[3] True was pregnant with her third child at trial.

disparaging each other in front of Luke, consuming illegal drugs, and using nicotine products around Luke. It also specifically enjoined Harris from, among other things, recording True without her consent, allowing Edwards or Carlson to care for Luke, impersonating True or otherwise accessing or distributing her protected information, and stalking or harassing True. After moving for reconsideration, Harris perfected this appeal.

## DISCUSSION

In five issues on appeal, Harris argues that the trial court erred by (1) granting retroactive child support and medical support without crediting payments he already made, (2) assessing trial and appellate attorney's fees against him, (3) not awarding certain possession terms, (4) awarding True the exclusive right to make invasive medical decisions and naming True the "tie-breaker" on educational, psychological, and psychiatric decisions, and (5) entering permanent injunctions against him.

We review each of these issues under an abuse-of-discretion standard. *See Gonzales v. Gonzales*, 704 S.W.3d 54, 78 (Tex. App.—Austin 2024, no pet.) (child-support awards); *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996) (attorney's fees); *In re J.R.D.*, 169 S.W.3d 740, 742–43 (Tex. App.—Austin 2005, pet. denied) (possession); *Kazmi v. Kazmi*, 693 S.W.3d 556, 565–66 (Tex. App.—Austin 2023, pet. denied) (conservatorship); *Gerges v. Gerges*, 601 S.W.3d 46, 61 (Tex. App.—El Paso 2020, no pet.) (injunctive relief in SAPCR). A trial court abuses its discretion when it rules arbitrarily, unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022). In this context, the abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *Zeifman v. Michels*, 212 S.W.3d

7

582, 587 (Tex. App.—Austin 2006, pet. denied).  Legal and factual sufficiency of the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion.  *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.).  The reviewing court determines first "whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion."  *Id.*  The focus of the first inquiry is the sufficiency of the evidence, which we answer using traditional sufficiency standards of review.  *Kazmi*, 693 S.W.3d at 566.

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not."  *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020).  A party challenging the legal sufficiency of an adverse finding on which it did not bear the burden of proof at trial "must demonstrate on appeal that no evidence supports the adverse finding."  *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam).  We will sustain a no-evidence challenge when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact.  *Bos v. Smith*, 556 S.W.3d 293, 299–300 (Tex. 2018).

In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding."  *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).  When a party attacks the factual sufficiency of an adverse finding on which it did not bear the burden of proof, we will set aside the finding "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust."

8

*Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

Under either standard, the trier of fact "is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). We "may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder." *Kazmi*, 693 S.W.3d at 566. Further, we consider the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex. 1990). A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the court's decision. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). When, as here, the trial court makes findings of fact, any unchallenged fact findings are binding on an appellate court unless the contrary is established as a matter of law or no evidence supports the finding. *Hegar v. El Paso Elec. Co.*, 629 S.W.3d 518, 527 (Tex. App.—Austin 2021, pet. denied); *see also Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) ("We defer to unchallenged findings of fact that are supported by some evidence.").

## I.     The trial court did not abuse its discretion by ordering Harris to pay retroactive child support.

First, Harris argues that the trial court erred by ordering him to pay $22,080 in retroactive child support and $1,956.45 in retroactive medical-and-dental support for 2023.[4] Harris maintains that he made "consistent and substantial payments of voluntary support and payments

---

[4] Under the temporary orders, Harris's ongoing child-support obligations—which he does not challenge on appeal—began on January 1, 2024.

for necessaries for the benefit of the child during the relevant time," calculating his contribution as $24,477.13. Thus, Harris urges that the trial court abused its discretion by failing to credit his voluntary payments and asks this Court to vacate this judgment.

The Family Code permits a trial court to "order a parent to pay retroactive child support if the parent [] has not previously been ordered to pay support for the child; and [] was not a party to a suit in which support was ordered." Tex. Fam. Code § 154.009(a). The trial court has discretion to determine whether to award retroactive child support, as well as the amount of that support. *Gonzales*, 704 S.W.3d at 78. In ordering retroactive child support, the trial court "shall consider the net resources of the obligor during the relevant time period and whether:

> (1) the mother of the child had made any previous attempts to notify the obligor of his paternity or probable paternity;
>
> (2) the obligor had knowledge of his paternity or probable paternity;
>
> (3) the order of retroactive child support will impose an undue financial hardship on the obligor or the obligor's family; and
>
> (4) the obligor has provided actual support or other necessaries before the filing of the action."

Tex. Fam. Code § 154.131(b); *see id.* § 154.131(a) ("The child support guidelines are intended to guide the court in determining the amount of retroactive child support, if any, to be ordered."). "Section 154.131(b) does not bind the trial court to the listed factors in determining retroactive child support but is merely intended to guide the trial court in determining the amount of retroactive child support." *Gonzales*, 704 S.W.3d at 79 (quoting *Bunts v. Williams*, No. 01-17-00643-CV, 2019 WL 2220109, at *6 (Tex. App.—Houston [1st Dist.] May 23, 2019, no pet.) (mem. op.)). And if a trial court is presented with conflicting evidence, the court's decision awarding retroactive child support under the statute is not an abuse of discretion. *Id.*

The trial court's findings of fact and conclusions of law related to retroactive child support include the following:

28. Prior to the rendition of the temporary order requiring [Harris] to pay child support, [Harris] has not previously been ordered to pay support for the child.

29. Petitioner and Respondent never resided together.

30. In ordering retroactive child support, the court considered the net resources of the obligor during the relevant time period and whether:

(1) the mother of the child had made any previous attempts to notify the obligor of his paternity or probable paternity;

(2) the obligor had knowledge of his paternity or probable paternity;

(3) the order of retroactive child support will impose an undue financial hardship on the obligor or the obligor's family; and

(4) the obligor has provided actual support or other necessaries before the filing of the action.

31. Petitioner should be ordered to pay retroactive child support for the time-period January 1, 2023 through December 31, 2023 in an amount of $22,080.00 ($1,840.00 maximum guideline support x 12 months).

32. Petitioner should be ordered to pay retroactive medical and dental support for the time-period January 1, 2023 through October 31, 2024 in an amount of $1,956.45 [($81.05 x 22 months) + ($ 7.88 x 22 months)].

That is, the trial court did consider the requisite factors under Section 154.131(b) before awarding "maximum guideline support" in retroactive child support for the twelve months during which Harris was not previously ordered to pay child support. *See* Tex. Fam. Code § 154.131(b); *see also id.* § 154.125(b) (application of child-support guidelines to net resources). Harris appears to contest only subsections (b)(3) and (4), as he maintains on appeal that the trial court abused its discretion because there was "undisputed evidence" of his "significant financial contributions and upon review of that evidence the trial court did not make a reasonable decision

11

regarding the retroactive child support and medical support." But contrary to Harris's argument, Section 154.131(b) does not require the trial court to credit past payments—only that the trial court "shall consider" payments of actual support or other necessaries. *Id.*; *see In re Sanders*, 159 S.W.3d 797, 802 (Tex. App.—Amarillo 2005, no pet.); *accord Estrada v. Garrett-Estrada*, No. 03-22-00017-CV, 2023 WL 3132552, at *6 (Tex. App.—Austin Apr. 28, 2023, pet. denied) (mem. op.) ("[T]he listed factors in section 154.131 do not bind the trial court but are 'merely intended to guide the trial court in determining the amount of retroactive child support.'" (quoting *In re J.H.*, 264 S.W.3d 919, 924 (Tex. App.—Dallas 2008, no pet.))); *In re A.B.*, 368 S.W.3d 850, 860 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (noting that Section 154.131(b)(4) "includes no requirement that the trial court *must* credit a retroactive award if the obligor has provided any actual support."). It did so here.

Further, sufficient evidence supports the trial court's finding that it considered whether the retroactive-child-support award will impose an undue financial hardship on Harris or his family and whether Harris had previously provided support before ordering him to pay retroactive child support for 2023. Though Harris relies on pre-marked exhibit "Petitioner's Exhibit 77" as evidence of his financial contributions, that exhibit—a spreadsheet listing some of Luke's expenses from 2022 through 2023 that Harris says he paid for—was not admitted at trial but was instead attached to Harris's post-judgment motion for reconsideration. As support for his argument on appeal, Harris also cites to his deposition, in which he testified that he did not pay child support during the first year of Luke's life, but he bought car seats, formula, bottles, clothing, and "some extras" that True "asked for," stating that he "got everything that she wanted." Harris also testified that he drew an annual equity salary from his business of approximately $100,000 to $150,000 and filed a tax return reflecting $2 million in business income. Harris has not pointed to

12

any place in the record where he contended that such an award would impose a financial burden on him or his family.[5]

It is undisputed that Luke has lived with True in her home since birth and that True covers Luke under her employer's health insurance plan. And Harris testified at trial that despite True's requests for him to contribute to her mortgage, he "didn't want to pay for her house," though he "would pay all of her bills." True also testified that "at the beginning right after [Luke] was born," "it was very difficult to try to get [Harris] help with our child" financially.

In sum, the trial court was within its discretion to award retroactive child support and medical-and-dental support for 2023, and it had sufficient evidence before it to reasonably determine that the amount of retroactive support should equal the amount of ongoing "maximum guidelines" support that Harris had been ordered to pay. Even if Harris's Petitioner's Exhibit 77 had been admitted at trial, the trial court could have resolved any conflicting evidence in True's favor. *See Gonzales*, 704 S.W.3d at 79. Viewing the trial court's findings in the light most favorable to the judgment, we cannot conclude that the trial court abused its discretion by ordering Harris to pay retroactive child support and medical support in the amount that it ordered him to pay. We overrule Harris's first issue.

---

[5] On appeal, Harris generally cites to the 2,782 pages of the parties' text messages from 2019 through the litigation which were admitted as evidence at trial, but he does not specify which messages support this argument.

**II.** **The trial court did not abuse its discretion by ordering Harris to pay True's attorney's fees, but we remand because the amount awarded is based on unsegregated fees.**

Next, Harris argues that the trial court abused its discretion by ordering him to pay $92,096.06 of True's trial attorney's fees and $15,000 for True's appellate attorney's fees. He contends that insufficient evidence supports the request and points to several billing entries attributable to the protective-order suit that are not segregated from the SAPCR-suit fees.

In Texas, attorney's fees are not recoverable unless authorized by statute or contract. *In re B.N.L.-B.*, 375 S.W.3d 557, 566 (Tex. App.—Dallas 2012, no pet.) (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006)). A party seeking attorney's fees must show that the fees were incurred on a claim that allows their recovery and generally must segregate these fees incurred from different claims for which fees are not recoverable. *See Chapa*, 212 S.W.3d at 313; *Frank v. Metalink, L.L.C.*, No. 03-22-00486-CV, 2024 WL 5248527, at *7 (Tex. App.—Austin Dec. 31, 2024, no pet.) (mem. op.). "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14. Relevant here, in SAPCRs, the Family Code provides the trial court with discretion to "render judgment for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney." *Coburn*, 433 S.W.3d at 838 (quoting Tex. Fam. Code § 106.002). The Family Code also provides that in protective-order suits resulting in family violence findings or an agreed protective order, a trial court "may assess reasonable and necessary attorney's fees . . . against the party found to have committed family violence or a party against whom an agreed protective order is rendered[.]" Tex. Fam. Code § 81.005; *see also Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (noting that statutes that

14

provide a court "may" award attorney's fees "affords the trial court a measure of discretion in deciding whether to award attorney fees or not").

"A claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501–02 (Tex. 2019). "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when those services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502. When a party seeks conditional appellate fees, it must present evidence "about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020).

First, Harris argues that True did not provide sufficient evidence that the trial or conditional appellate attorney's fees were reasonable or necessary, contending that True "put on zero live courtroom witnesses to testify to attorney fees" and instead "emailed to the Court" her counsel's affidavit and records. But Harris agreed to that. At the end of the jury trial, the parties agreed on the record to have the trial court decide the issue by evidence submitted on briefs:

> The Court: Is there going to be any additional evidence on attorney's fees or do I have all of it?
>
> True's counsel: I was going to submit an un-redacted fee and an affidavit proving up the fees with the bills altogether in a package.
>
> Harris's counsel: We'll do the same thing, and I'll try to get together like an agreed summary. There's a lot, so.

15

Thus, to the extent that Harris challenges the fact that the trial court decided the attorney's fees issue by submission, he failed to preserve that argument for appeal. *See* Tex. R. App. P. 33.1 (preserving error for appellate review requires timely request or objection in trial court).

Further, True submitted sufficient evidence in support of the fee request under the requisite standards. *See Rohrmoos Venture*, 578 S.W.3d at 502. True supported her request for fees with a declaration from her trial counsel explaining the basis for her fee request using the recognized *Rohrmoos Venture* factors and noting her hourly rate and the hourly rate of each of the timekeepers on this case. Attached to the declaration was her counsel's resume, True's contract with her trial attorney, and the detailed hourly billing records that showed each timekeeper's legal services performed, approximately when they were performed, and how long it took to perform the services. True's proof supporting her trial attorney's fee request meets the sufficient-evidence standard articulated in *Rohrmoos Venture*, and the trial court thus had sufficient evidence upon which to base its trial attorney's fees award. *See id.*

Likewise, True's evidence in support of her request for conditional appellate attorney's fees is sufficient to support the trial court's award. Her trial counsel testified that she "charge[s] $375.00 for [her] work on an appeal," noting that the appellate work would require, among other tasks, a "[r]eview [of] all trial transcripts and exhibits" over the four-day trial, which she estimated would "take about 3-5 hours per day of testimony to review and outline," and "[d]raft[ing] Appellee's brief on the merits," which she estimated would require "3-5 hours of legal research, depending on the complexity of the issue," per "each issue Appellant raises on appeal." True's counsel estimated that "it will take no less than 40 hours to defend against an appeal," and calculated a $15,000 total request based on her hourly rate. Because True presented evidence "about the services [she] reasonably believes will be necessary to defend the appeal and a

16

reasonable hourly rate for those services," the trial court had sufficient evidence upon which to base its conditional appellate attorney's fees award. *See Yowell*, 620 S.W.3d at 355.

However, we agree with Harris that the evidence supporting True's attorney's fees request did not properly segregate fees attributable to the protective-order suit. Unlike the trial court in the SAPCR, which had statutory authority to "render judgment for reasonable attorney's fees," *see* Tex. Fam. Code § 106.002, the trial court in the protective-order suit did not have the statutory authority to "assess reasonable and necessary attorney's fees" against Harris because it did not conclude that Harris "committed family violence" or render an agreed protective order against Harris, *see id.* § 81.005.[6] But as Harris points out, the billing records submitted in support of True's attorney's fees request include several entries that reflect work on the protective-order suit. And here, the attorney's fees incurred in the protective-order suit are not "so intertwined" with the SAPCR "that they need not be segregated." *See Chapa*, 212 S.W.3d at 313–14; *cf. In re Sanders*, 159 S.W.3d at 803 ("[B]ecause fees are recoverable in both a suit to establish parentage and to obtain retroactive fees and those were the two claims [appellee] pursued, neither she nor her attorney were obligated to segregate the fees as alleged by [appellant]."). Instead, the records reflect "discrete legal services," most of which were done to advance the SAPCR—a "recoverable" claim—but some of which appear to have been in service of the protective order—an "unrecoverable" claim.[7] *See Chapa*, 212 S.W.3d at 313–14.

---

[6] The record contains docket notes from the protective-order suit noting that "the court found [] an act of harassment had been committed," but the Family Code definition of "family violence" does not include "an act of harassment." *See* Tex. Fam. Code § 71.004 (defining "family violence").

[7] For example, billing records include entries such as "Revise Application for PO" and "arrange service of protective order and show cause," alongside entries such as "call with GAL" and "In deposition of C True and C Harris." Many records are less clear (e.g., "In Court" and "Call

17

Thus, the trial court did not err by awarding True's attorney's fees request, but it did err by granting a fee award based on unsegregated billing records that include evidence of attorney's fees related to an unrecoverable claim. While we overrule Harris's attorney's fees issue to the extent he challenges the award, we sustain his issue to the extent he challenges the amount. *See Kinsel v. Lindsey*, 526 S.W.3d 411, 428 (Tex. 2017) ("A failure to segregate attorneys fees does not preclude an attorneys-fees recovery."). "Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be," and "an unsegregated damages award requires a remand." *Chapa*, 212 S.W.3d at 314.

### III. The trial court did not abuse its discretion by deviating from the standard possession order.

Harris's next issue challenges the trial court's order's deviation from the expanded standard possession order. Specifically, he contends that the trial court erred by not awarding him weekly overnight possession on Thursdays, *see* Tex. Fam. Code § 153.317(a)(2), and not extending holiday weekends by one overnight during the school year after Luke turns three, *see id.* § 153.317(a)(8), (9). Instead, the order awards Harris possession on alternating Wednesdays beginning at 8:00 a.m. and ending at 8:00 a.m. the following morning during the school year and does not include a provision that extends Harris's possession over a holiday weekend.[8]

---

with client"), and thus make a suggestion of remittitur untenable. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Dev. & Rsch. Corp.*, 299 S.W.3d 106, 124 (Tex. 2009) (noting that "when there is some evidence of damages, but not enough to support the full amount" court of appeals may consider suggestion of remittitur or remand).

[8] The order also deviates from the standard-possession order in that it provides alternating weekly possession during the summer, but Harris does not challenge this provision on appeal.

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002. The standard possession order sets the minimum possessory rights of the parent who does not have the right to establish the child's primary residence. *See id.* §§ 153.312 (standard possession order for parents who live less than 100 miles apart), .313 (standard possession order for parents who live more than 100 miles apart). There is a rebuttable presumption that the standard possession order "provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator" and "is in the best interest of the child." *Id.* § 153.252. But the trial court may deviate from the standard possession order if necessary for the child's best interest. *See id.* § 153.256; *In re K.S.*, 492 S.W.3d 419, 429 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). In deviating from the standard possession order, the trial court must consider "the age, developmental status, circumstances, needs, and best interest of the child"; "the circumstances of the managing conservator and of the parent named as a possessory conservator"; and "any other relevant factor." Tex. Fam. Code § 153.256. Section 153.317 provides that "the court shall alter the standard possession order" to allow for an expanded period of possession "unless the court finds that the election is not in the best interest of the child." *Id.* § 153.317(a); *Kazmi*, 693 S.W.3d at 575–76.

The trial court issued the following findings concerning possession and access:

18. The Court finds that the possession order varies from the standard possession order and the following are the reasons for variance from the standard possession order:

Petitioner has a history of abusing alcohol and illegal drugs;

Petitioner demonstrates instability in his housing and his plans for the future;

19

> Petitioner engaged in harassing conduct directed at Respondent, which undermines the security and wellbeing of the child's primary caregiver; and

> The court's possession order conforms to the recommendations made by the court-appointed guardian ad litem.

19. The possession order is in the best interest of the child.

Harris argues that "nothing in the record" supports the deviation from the standard possession order. But the court had ample evidence to support the findings above. As to Harris's history of abusing alcohol and drugs, Harris agreed that he was an "occasional user of hard or illegal drugs" and testified that he most recently used cocaine in April 2023, four months after Luke was born. Harris also admitted to drinking and driving on multiple occasions and mixing alcohol, cocaine, and Adderall. Regarding Harris's instability in housing and future plans, the court heard Harris's testimony that he was living in a furnished apartment and was working with a realtor to buy a house in Austin, but he did not have specific plans for his housing or which school or preschool Luke could attend. Further, until the Friday before trial, Harris sought to include Collin County as part of the geographic restrictions for Luke's primary residence until agreeing to limit the restrictions to Travis County the week of trial.

As to Harris's harassing conduct towards True, Harris admitted that he made a fake email address to impersonate True and create a Walgreens account in her name to check her prescriptions without her permission. Harris further admitted that he had set up a credit monitoring account in True's name. He also agreed that he was in an on-and-off relationship with True while working with his attorneys on this litigation and admitted to making recordings of True during this time to serve as evidence in the case. Finally, Harris agreed that the guardian ad litem was appointed at his request to make recommendations to the court, and the guardian ad litem's

recommendations—which included the deviations from the standard possession order that Harris challenges on appeal—were admitted as evidence.

In support of his position on appeal, Harris points to the fact that he is "an active participant" in Luke's life, "attended appointments," "participate[d] in extracurricular activities," "ensured that [Luke] had close relationships with his family," "moved from Dallas to the Austin area, within the same school district as True, so he could be closer to his child," and "had ample flexibility with his work schedule[] to ensure that he was available to care for [Luke]." Although this evidence could support awarding an expanded standard possession schedule, that does not render the evidence supporting the order legally or factually insufficient. *See HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254, 259 (Tex. 2021) ("A trial court does not abuse its discretion when basing a decision on conflicting evidence."); *see, e.g.*, *Kazmi*, 693 S.W.3d at 577 (finding sufficient evidence supported trial court's deviation from standard possession order despite conflicting evidence). Because sufficient evidence supports the trial court's deviation from the standard possession order, we overrule Harris's third issue.

IV. **The trial court did not abuse its discretion by awarding True the exclusive right to make invasive medical decisions and the "tiebreaker" decision on education, psychological, and psychiatric decisions.**

Harris contends that the trial court erroneously awarded True the exclusive right to make invasive medical decisions and appointing True as the parent with the "tiebreaker" decision on education, psychological, and psychiatric decisions. He maintains that the evidence supporting these decisions was legally and factually insufficient and argues that it is in Luke's best interest for both parties to share these decisions.

21

When, as here, parents are both appointed conservators of the child, the trial court must allocate parental rights and duties to be exercised independently, jointly, or exclusively. Tex. Fam. Code §§ 153.071 (court required to specify rights and duties of parent appointed conservator), .072 (court may limit conservator's rights and duties if it makes written finding that limitation is in child's best interest), .134(b)(2), (4) (rights and duties in court-ordered joint conservatorship); *see also id.* § 151.001 (parental rights and duties). Parents can be appointed joint managing conservators even if the exclusive right to make certain decisions is awarded to only one parent. *See id.* § 101.016 (defining "joint managing conservatorship" to mean "the sharing of the rights and duties of a parent by two parties, ordinarily the parents, even if the exclusive right to make certain decisions may be awarded to one party"); *Coburn*, 433 S.W.3d at 827.

Sufficient evidence supports the trial court's decision to award True the exclusive right to make invasive medical decisions and appoint True as the parent with the "tiebreaker" decision on education, psychological, and psychiatric decisions. For example, the trial court heard evidence that True had made most of the medical decisions for Luke, including scheduling and attending all medical appointments, arranging for a specialist to resolve Luke's tongue tie, raising concerns about Luke's speech development, and establishing Luke's speech-therapy schedule. True also has covered Luke on her employer's health-insurance plan since he was born. The trial court heard Harris's testimony that he has not had health insurance coverage for himself as an adult, as well as Lynch's recommendation that True have the exclusive right to make invasive medical decisions for Luke. Regarding education decisions, the trial court heard True's testimony about specific plans for where she would like Luke to attend preschool and school, in contrast to Harris's uncertainty regarding his living situation and his plans for or understanding of where Luke could attend school. The record also supports the conclusion that while the parties had difficulty

22

communicating, they generally agreed on decisions regarding Luke's medical care or education. Based on this evidence, the trial court could have reasonably determined that awarding True the exclusive right to make invasive medical decisions and the "tiebreaker" decision on education, psychological, and psychiatric decisions is in Luke's best interest. *See, e.g.*, *Gopalan v. Marsh*, 706 S.W.3d 650, 671–72 (Tex. App.—Austin 2025, pet. filed) (determining trial court did not abuse discretion by awarding mother right to make educational, medical, and psychological decisions for children when record supported that mother historically "handled most" of these needs); *Coburn*, 433 S.W.3d at 828 (same).

Because sufficient evidence supports the trial court's challenged conservatorship decisions, we overrule Harris's fourth issue.

## V. The trial court did not err by entering injunctive relief.

Finally, Harris argues that the trial court abused its discretion by enjoining him from the following specific conduct, which True sought in her counterpetition:

1. Recording Chelsea True – or enlisting a third party to do so – in the presence of any minor child without her express written consent, including at exchanges of the child or family-related events;

2. Allowing the child to be babysat or cared for by Austin Edwards and/or Susan Carlson at any time;

3. Engaging in stalking as described in section 42.072 of the Texas Penal Code;

4. Engaging in conduct directed specifically toward Chelsea True, including following Chelsea True, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass Chelsea True;

5. Impersonating Chelsea True or distributing protected information of Chelsea True in person or online, including but not limited to creating false email addresses, creating any accounts or profiles using the name of Chelsea True, and disclosing Chelsea True's social security number;

23

6. Accessing and/or distributing protected health information of Chelsea True;

7. Distributing reports, records, and evaluations from this case to any third party not retained as an expert in this case;

8. Using, in any way, email accounts in the name of Chelsea True or purporting to be Chelsea True.

The trial court found that "[t]he permanent injunctions set forth in the final order are necessary and in the best interest of the child." Harris contends that the evidence was insufficient to justify the above injunctions, which he characterizes as "far too restrictive" and "exceeds what is required to protect the best interest of [Luke]."

Although the Family Code does not expressly address when a trial court may issue a permanent injunction in a SAPCR proceeding, it is well established that the trial court may do so when the injunction is in the child's best interest. *Gerges*, 601 S.W.3d at 61; *see Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied); *see also* Tex. Fam. Code § 153.193 (authorizing trial court to impose "restrictions or limitations on a parent's right to possession of or access to a child" that do "not exceed those that are required to protect the best interest of the child"). The general standards applicable to permanent injunctions in civil cases (i.e., a wrongful act, imminent harm, irreparable injury, and no adequate remedy) do not apply in family-law cases, and the trial court has the discretion to impose restrictions on parents it determines are in the children's best interest.[9] *See Peck*, 172 S.W.3d at 35–36; *Messier v. Messier*, 389 S.W.3d 904, 908

---

[9] Some courts of appeals have held that "the usual rules applicable to permanent injunctions in civil cases apply." *See King v. Lyons*, 457 S.W.3d 122, 130–31 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (discussing different approaches by courts of appeals to injunctive relief in SAPCRs); *see, e.g.*, *In re A.A.N.*, No. 02-13-00151-CV, 2014 WL 3778215, at *1 (Tex. App.—Fort Worth July 31, 2014, no pet.) (mem. op.). However, this Court has previously concluded otherwise. *See Steenrod v. Pidgeon*, No. 03-22-00659-CV, 2024 WL 3528672, at *5 (Tex. App.—Austin July 25, 2024, no pet.) (mem. op.) ("The general standards applicable to permanent injunctions in civil cases (i.e., a wrongful act, imminent harm, irreparable injury, and no adequate

(Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[C]ourts routinely grant permanent injunctions" in child custody cases "consistent with the best interests of the children."); *see, e.g.*, *Steenrod v. Pidgeon*, No. 03-22-00659-CV, 2024 WL 3528672, at *5 (Tex. App.—Austin July 25, 2024, no pet.) (mem. op.) (upholding injunctive relief in SAPCR).

Sufficient evidence supports the trial court's decision to enter the above injunctive relief based on its determination that it is in Luke's best interest. As to the first injunction—prohibiting Harris from recording True with a child without her consent—Harris maintains that there was "no evidence" that he recorded True without her permission in Luke's presence. But Harris testified that he had recorded True, as well as recorded Evan without True's consent and while True was not present. Harris agreed that he could see how True "would find that invasive." Harris also admitted into evidence a recording he made of True without her consent during a phone call between the parties during this litigation. Thus, there was sufficient evidence from which the trial court could have concluded that it was in Luke's best interest to prevent Harris from recording True with a child without her consent. *See, e.g.*, *Gerges*, 601 S.W.3d at 62 (finding sufficient evidence that injunction prohibiting father from recording mother or staff at children's schools in children's best interest); *In re S.C.T.*, No. 09-23-00044-CV, 2025 WL 635082, at *37 (Tex. App.—Beaumont Feb. 27, 2025, no pet.) (mem. op.) (upholding injunction restricting father from recording child and others because sufficient evidence established prohibition was necessary to protect child's best interest).

Sufficient evidence likewise supports the second injunction—prohibiting Edwards and Carlson from caring for Luke. The record establishes that Harris left Luke in Edwards's care,

_____

remedy) do not apply in family-law cases, and the trial court has the discretion to impose restrictions on parents it determines are in the children's best interest.").

despite Harris's acknowledgment that he knew Edwards is a recovering alcoholic, had child-protective services investigations regarding his own children in the past, and had committed domestic violence against his partner. Harris also admitted to taking Luke to visit Carlson without telling True and later learned that a court order prevents Carlson from having contact with Evan. Harris testified that he "could see how [True] would be upset about [Luke] seeing someone that she doesn't want to see" and admitted that he stopped talking to Carlson after Lynch advised him to. *See, e.g.*, *In re Marriage of Keys*, No. 06-19-00018-CV, 2019 WL 4865671, at *8 (Tex. App.—Texarkana Oct. 3, 2019, no pet.) (mem. op.) (finding sufficient evidence to support injunction prohibiting father from allowing contact between child and individual who, among other things, had used illegal drugs in the past that father knew about and "was not opposed to it"); *Peck*, 172 S.W.3d at 32–35 (upholding injunction prohibiting parents from hosting romantic partners overnight while in possession of child).

Injunctions three through eight prohibit Harris from impersonating True, accessing True's protected health information, distributing records, and engaging in conduct "that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" True. Harris admitted that he created fake email accounts and at least one pharmacy account in True's name, as well as set up a credit monitoring account without her consent. True testified that she expressed concerns that Harris had "stalked" her, that Harris's actions were a "betrayal," and that in response to her concerns about Harris impersonating her online, she contacted the police. True also admitted into evidence docket notes from the protective-order hearing, in which the trial court noted "an act of harassment had been committed," and the affidavit for Harris's arrest after he was indicted by a grand jury for violating Texas Penal Code Section 32.51(c)(1). *See* Tex. Penal Code §§ 32.51(c)(1) (defining fraudulent use or possession of identifying information as state jail felony if items used

26

is less than five); 42.072(a)(2)(B) (defining commission of stalking). That is, the record provided some evidence of a substantive and probative character supporting the trial court's finding that it is in Luke's best interest to prohibit Harris from engaging in this conduct. *See, e.g.*, *Gerges*, 601 S.W.3d at 63 (finding sufficient evidence supporting injunction prohibiting father from leaving children alone and unsupervised in running vehicle based in part on "obvious safety issues" and behavior that "can be considered criminal in some instances"); *see also Philipp v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00418-CV, 2012 WL 1149291, at *9 (Tex. App.—Austin Apr. 4, 2012, no pet.) (mem. op.) ("[O]nce the child is brought under [the court's] jurisdiction by suit and pleading cast in terms of custody and control, it becomes the duty of the court in the exercise of its equitable powers to make proper disposition of all matters comprehended thereby in a manner supported by the evidence." (quoting *Leithold v. Plass*, 413 S.W.2d 698, 701 (Tex. 1967))).

On this record, we cannot conclude that the trial court had insufficient evidence to exercise its discretion or that it exercised its discretion unreasonably in finding that the injunctive relief is in Luke's best interest. We overrule Harris's fifth issue.

## CONCLUSION

Because True's trial attorney's fees award was based on unsegregated billing records, we remand this issue to the trial court to allow True to present evidence of segregated attorney's fees for the SAPCR and for the trial court to reconsider the attorney's fees award. We otherwise affirm the order.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed in Part; Reversed and Remanded in Part

Filed:   October 17, 2025